ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/22/16
```

COOPERATIVA AGRARIA INDUSTRIAL
NARANJILLO LTDA.,

                        Petitioner,

          - against -

TRANSMAR COMMODITY GROUP LTD.,

                        Respondent.

16 Civ. 3356 (LLS)

**OPINION & ORDER**

        Petitioner Cooperativa Agraria Industrial Naranjillo

Ltda.'s ("Naranjillo") petition seeks to vacate an arbitration

award entered in favor of respondent Transmar Commodity Group

Ltd. ("Transmar"). Transmar counterclaims for confirmation of

the award.

                        **BACKGROUND**

                        The Parties

        Naranjillo is an agricultural cooperative, formed under the

laws of Peru. Its main offices are located in Peru. It consists

of approximately 5,000 Peruvian cocoa and coffee farmers, all of

whom live and work in Peru. Memo (Dkt. No. 5) at 2-3. Transmar

is a New Jersey based cocoa trading house which, among other

things, engages in purchasing cocoa products from entities such

as Naranjillo. Id. at 3. Transmar is a member of The Cocoa

Merchants' Association of America, Inc. ("CMAA"), which is

headquartered in New York, New York. Id. at 1.

                        -1-

The Cocoa Butter Contracts

In six separate one-page documents, each dated August 30, 2012, Naranjillo and Transmar entered into six agreements under which Naranjillo was to deliver specified quantities of Peruvian UTZ Certified Cocoa Butter to Transmar on dates specified in each document. Pilares Decl. (Dkt. No. 6) Exh. B; Nácer Decl. (Dkt. No. 14) Exh. F.

Each of the six one-page documents are on Transmar letterhead and each is titled "STANDARD 2-A CONTRACT." Each document has a unique Buyer Number, ranging in numerical order from P005512 to P005517. Each document identifies Transmar as the buyer and Naranjillo as the seller; describes the product to be purchased as "PPP Peruvian UTZ Certified Cocoa Butter"; calls for a specified quantity of the product measured in weight; designates a specific shipment date (ranging from January/February 2013 to December 2013); identifies the destination where the butter is to be shipped as Hamburg, Germany; and sets the price to be paid by the buyer. Pilares Decl. Exh. B.

The last provision in each of the documents before the signature line is titled "Conditions" and reads, id.:

> This contract is subject to the terms and conditions of Standard 2-A Contract of the Cocoa Merchants Association of America, Inc., and subject to any other conditions imposed by the United States Government. Any tariffs imposed by the United States Government are assumed and will be paid by the

-2-

buyer.

Each of the six documents is signed on behalf of the buyer by a representative of Transmar and on behalf of the seller by Isaac Zuñiga, who at the time was Naranjillo's General Manager.[1]

Naranjillo made no deliveries under any of those contracts. Memo at 1.

## CMAA Standard Contract 2-A

According to Transmar, the provision in each of the cocoa butter contracts under the title "Conditions" had the effect of incorporating into its agreements with Naranjillo all terms and conditions included in a document titled "THE COCOA MERCHANTS' ASSOCIATION OF AMERICA, INC. STANDARD CONTRACT 2-A" ("CMAA Standard Contract 2-A"). Nácer Decl. Exh. K. Its sub-heading states "Covering F.O.B. Terms for Shipments to the United States,"[2] and the footer of each page says "Contract 2A as of 12/09/02." Id. The CMAA has apparently prepared this document for its members to use in contracts for the sale of cocoa products.

The first page of the CMAA Standard Contract 2-A has a list of standard provisions in contracts for the sale of cocoa

---

[1] There has been some dispute whether Zuñiga actually signed the sixth contract, Memo at 22; Nácer Decl. Exh. F., but it has become immaterial.

[2] The butter covered by the agreements was to be shipped to Germany, so if Naranjillo had obtained a copy of the CMAA Standard Contract 2-A it might have wondered if it had the right one. Later, the shipments were redirected to the United States, according to Transmar. Opp. at 6; Nácer Decl. ¶ 7.

-3-

products, namely, quantity, description, quality, destination,

price, and shipment, with blank lines to be filled in by the

parties for the particular transaction. The rest of the document

has provisions covering packaging, payment, and claims of

infestation requiring fumigation; duties and taxes, marketing,

force majeure, insolvency, and assignment.

The thirteenth provision in the CMAA Standard Contract 2-A

is titled "Defaults" and provides, id.:

> When either party to a contract claims that a default has
> occurred, then failing an amicable settlement, the dispute
> shall be referred to arbitration pursuant to the arbitration
> rules of The Cocoa Merchants' Association of America, Inc. . .
> . The arbitrators shall have full discretion to fashion an
> award as they deem appropriate under the circumstances,
> including, but without limitation, an award of damages
> consisting of (i) the difference between the contract price
> and the closing out price; (ii) ordinary, special and/or
> consequential damages, and (iii) reasonable legal,
> professional and other costs incurred in connection with the
> default and/or arbitration and/or enforcement of an award. . .
> .

The last provision on the CMAA Standard Contract 2-A is

numbered 22 and is titled "Arbitration." It provides, id.:

> Any question, controversy, claim or dispute whatever arising
> out of, or under this contract, not adjusted by mutual
> agreement, shall be settled by arbitration in the City of New
> York, State of New York, under the auspices of and in
> accordance with rules of THE COCOA MERCHANTS' ASSOCIATION OF
> AMERICA, INC. and judgment upon the award rendered may be
> entered in the Supreme Court of the State of New York in
> accordance with the provisions of the laws of the State of New
> York.
>
> The parties to this contract do hereby waive personal service
> of any papers, notices or process necessary or proper in
> connection with the foregoing. Such papers, notices or process
> may be served in accordance with the rules of THE COCOA

$-4-$

MERCHANTS' ASSOCIATION OF AMERICA, INC. This contract is
deemed made in New York and shall be construed pursuant to the
laws of the State of New York.

No copy of the CMAA Standard Contract 2-A was furnished to
Naranjillo at or before the time of execution of the cocoa
butter contracts. Memo at 4. It was not brought to Naranjillo's
attention that among the conditions of the full (i.e., to be
incorporated) contract, there were arbitration clauses.

### The Arbitration Proceeding

On October 15, 2015, Transmar filed a Notice of Demand for
Arbitration with the CMAA in New York seeking to recover damages
resulting from Naranjillo's failure to perform under the six
contracts at issue here (and for Naranjillo's partial failure to
perform under another contract not at issue in this dispute).
Pilares Decl. Exh. A. The CMAA appointed an arbitration panel,
id. Exhs. D, F, which held a hearing on February 4, 2016 in New
York, New York. Id. Exh. H.

In the evidence Transmar submitted to the panel in advance
of the arbitration hearing, it included a copy of an eight page
document titled "THE COCOA MERCHANTS' ASSOCIATION OF AMERICA,
INC. 2A CONTRACT," dated February 12, 2013. Pilares Decl. Exh. G
at 39. This document appears to be an updated version of the
CMAA Standard Contract 2-A dated December 9, 2002, and contains
an arbitration provision identical to that in the CMAA Standard
Contract 2-A dated December 9, 2002. However, the two documents

-5-

are different and some of their provisions are different.[3] Id.

Transmar appeared at the hearing, but Naranjillo did not appear and was not represented by counsel. Following the hearing, the panel found that Naranjillo defaulted on the six contracts at issue and ordered Naranjillo to pay $2,606,626.60 to Transmar. Id. Exh. L.

Naranjillo filed this petition to vacate the arbitration award.

According to Naranjillo, Transmar never proposed an arbitration agreement during the negotiation or execution of the agreements, and Naranjillo would not have consented to an arbitration agreement if one had been proposed. Memo at 15. Naranjillo asserts that it was not made aware of the arbitration provision until Transmar filed a claim against it. Petition (Dkt. No. 1) ¶ 7.

Naranjillo argues that the award should be vacated because "there was never an agreement to arbitrate between Naranjillo and Transmar" as "there was no 'meeting of the minds' between

---

[3] For instance, the 2013 document contains the baffling provision that states:

> The wording "Subject to terms of Standard Contract 2-A of The Cocoa Merchants' Association of America, Inc." or a clause, phrase or sentence of equal or similar import, shall be understood to incorporate the full terms of Contract 1-A [sic] as hereinafter set forth as though said Contract 2-A were fully written into the contract.

Pilares Decl. Exh. G at 41 (ECF number at top of page). The CMAA Standard Contract 2-A dated December 9, 2002 does not contain such a provision. See Nácer Decl. Exh. K.

the parties to subject disputes to arbitration pursuant to the

model CMAA arbitration clause." Memo at 10.

### DISCUSSION

Section 10(a) of the Federal Arbitration Act provides:

In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

Naranjillo argues that the CMAA arbitrators exceeded their

powers because the dispute was not subject to arbitration, and

that the award should be vacated under Section 10(a)(4). Memo at

10.

The parties do not dispute that the CMAA Standard Contract

2-A that contains the arbitration provisions was not discussed

or signed by the parties. Transmar, however, argues that the

arbitration provisions contained in that document were

incorporated into the parties' contracts by reference and is

-7-

therefore binding on both parties. Opp. (Dkt. No. 16) at 19.

Transmar argues that when Naranjillo signed the cocoa butter contracts, it consented to all of their provisions, including the provision that incorporated the terms and conditions of the CMAA Standard Contract 2-A, both the 2002 and 2013 versions of which in turn contained the arbitration agreement. According to Transmar, because nothing prevented Naranjillo from obtaining a copy of the CMAA Standard Contract 2-A and reading its terms before it signed the cocoa butter contracts, Naranjillo was fully bound to its terms. Sur-Reply (Dkt. No. 30) at 3.

It is clear that "Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." Volt Info. Scis., Inc. v. Bd. of Trs., 489 U.S. 468, 479, 109 S. Ct. 1248, 1256 (1989). "[T]he arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943, 115 S. Ct. 1920, 1923 (1995). "A dispute is arbitrable only if the parties contractually bind themselves to arbitrate it. A question of arbitrability is therefore raised when, as here, someone asserts that an arbitral award should not be enforced because there was no effective agreement to arbitrate the dispute." Telenor Mobile Communs. AS v. Storm LLC,

-8-

584 F.3d 396, 405-06 (2d Cir. 2009).

"The question of whether the parties have agreed to arbitrate, i.e., the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." Nicosia v. Amazon.com, Inc., ___ F.3d ___, No. 15 Civ. 423, 2016 WL 4473225, at *4 (2d Cir. Aug. 25, 2016), citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83, 123 S. Ct. 588, 591 (2002). "The threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles." Id., citing Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 27 (2d Cir. 2002).

Naranjillo argues that the law governing interpretation and construction of the cocoa butter contracts is that of the United Nations Convention on Contracts for the International Sale of Goods ("CISG") as the contracts are for the "sale of goods between parties whose places of business are in different States." CISG art. 1(1); Memo at 11. However, Naranjillo acknowledges that "Because caselaw interpreting the CISG is relatively sparse, this Court is authorized to interpret it in accordance with its general principles, 'with a view towards the need to promote uniformity in its application and the observance of good faith in international trade.'" Hanwha Corp. v. Cedar Petrochemicals, Inc., 760 F. Supp. 2d 426, 430, (S.D.N.Y. 2011), quoting Delchi Carrier SpA v. Rotorex Corp., 71 F.3d 1024, 1028

-9-

(2d Cir. 1995); Memo at 12. In fact, many of the arguments advanced by Naranjillo in its brief are based on New York and Second Circuit case law. Memo at 12-16.

Transmar argues that New York law applies because of the CMAA Standard Contract 2-A provision that states "This contract is deemed made in New York and shall be construed pursuant to the laws of the State of New York" that Transmar claims is incorporated into the cocoa butter contracts by reference. Opp. at 19.

"Under New York law, the initial interpretation of a contract 'is a matter of law for the court to decide.'" K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996), quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996). Transmar correctly points out that "Under New York law, 'a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it.'" PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1201 (2d Cir. 1996), quoting Jones v. Cunard S.S. Co., 238 A.D. 172, 173, 263 N.Y.S. 769, 771 (N.Y. App. Div. 2d Dep't 1933). However, "For the terms of a separate agreement to be incorporated by reference, '[i]t must be clear that the parties knew of and consented to the terms to be incorporated by reference for these terms to be valid.'" Norcast S.ar.l. v. Castle Harlan, Inc., No. 12 Civ. 4973(PAC), 2014 WL

-10-

43492, at *5 (S.D.N.Y. Jan. 6, 2014), quoting Creative Waste

Mgmt., Inc. v. Capitol Envtl. Servs., Inc., 429 F. Supp. 2d 582,

602 (S.D.N.Y. 2006) (brackets in Norcast).

> "Under New York law and the law of [the Second] Circuit, two
> essential elements must be satisfied before a document will be
> deemed to have been incorporated by reference into another
> instrument or agreement. First, the agreement must
> specifically reference and sufficiently describe the document
> to be incorporated, such that the latter 'may be identified
> beyond all reasonable doubt.'" Ryan, Beck & Co., LLC. v.
> Fakih, 268 F. Supp. 2d 210, 223 (E.D.N.Y. 2003) (emphasis in
> original) (quoting Paine Webber Inc. v. Bybyk, 81 F.3d 1193,
> 1201 (2d Cir. 1996) (citing Chiacchia v. Nat'l Westminster
> Bank USA, 124 A.D.2d 626, 507 N.Y.S.2d 888, 889-90 (App. Div.
> 1986))) "Second, 'it must be clear that the parties to the
> agreement had knowledge of and assented to the incorporated
> terms.'" Id. (quoting Bybyk, 81 F.3d at 1201).

Torres v. Major Auto. Grp., No. 13 Civ. 687(NGG)(CLP), 2014 WL

4802985, at *7 (E.D.N.Y. Sept. 25, 2014) (brackets in Torres).

The incorporating language in the single-page cocoa butter

contracts stated "This contract is subject to the terms and

conditions of Standard 2-A Contract of the Cocoa Merchants

Association of America, Inc." Pilares Decl. Exh. B. However,

each of the one-page contracts signed were themselves titled

"STANDARD 2-A CONTRACT," see id., while the document Transmar

claims was incorporated is also titled "Standard Contract 2-A."

Nácer Decl. Exh. K. This gave the confusing impression that the

document being signed was itself the one to be incorporated.

Furthermore, the subheading of CMAA Standard Contract 2-A

provides "Covering F.O.B. Terms for Shipments to the United

States" id., leaving the seller to speculate whether it was

-11-

intended to cover shipments to Hamburg, Germany.[4] That may be immaterial since Naranjillo was never provided with any version of the Standard Contract 2-A document that was to be incorporated. Petition ¶ 7.

The fact that Transmar provided the panel a copy of the CMAA 2A Contract dated February 12, 2013 (well after the time when the contracts were executed in 2012), rather than the 2002 version, demonstrates the ease with which those documents were confused.

The decisive point is that "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." Bybyk, 81 F.3d at 1201. That is required because "As a general principle, an offeree cannot actually assent to an offer unless the offeree knows of its existence." Schnabel v. Trilegiant Corp., 697 F.3d 110, 121 (2d Cir. 2012) (quoting 1 Williston on Contracts § 4:16). There is no showing that Naranjillo actually knew of the existence of the arbitration clauses.

"[W]here there is no actual notice of the term, an offeree is still bound by the provision if he or she is on inquiry notice of the term and assents to it through the conduct that a

---

[4] Transmar asserts that the parties later revised the agreements to provide for shipment to Philadelphia, Opp. at 25; Nácer Decl. at 3, but this does not remove doubts whether when the documents were executed the reference clearly identified the CMAA Standard Contract 2-A.

-12-

reasonable person would understand to constitute assent."
Schnabel, 697 F.3d at 120 (emphasis in Schnabel). But Naranjillo
was not on inquiry notice that there was an arbitration
provision. The reference to "Standard 2-A Contract of the Cocoa
Merchants Association of America, Inc." did not reveal the
existence of an arbitration agreement. The one-page cocoa butter
contracts lacked any reference to an arbitration provision, and
did not disclose that one lurked in items 13 and 22 of the
material to be incorporated by reference.

Transmar argues that the CMAA Standard Contract 2-A was
available on CMAA's website,[5] and that Naranjillo could have
learned of the arbitration terms by conducting an internet
search. Sur-Reply at 3. Naranjillo replies that this document
was "simply not accessible at this time to non-members or the
general public on the CMAA's website" and that "To access it,
one must know the precise URL address that leads to that
document in a private section of the CMAA's website" which it
was not provided "until Transmar shared the precise URL address
in these proceedings." Final Reply (Dkt. No. 34) at 4.

But Naranjillo was not on notice to search for the terms of
an arbitration agreement, for it was not warned that an
arbitration agreement existed.

---

[5] http://www.cocoamerchants.com/content/PDF/CMAA_2A_CONTRACT.pdf.

-13-

Accordingly, the incorporation of the arbitration clauses was never effectively accomplished. There was no knowing or implied agreement to arbitrate, and the award must be vacated.

**CONCLUSION**

Petitioner Cooperativa Agraria Industrial Naranjillo Ltda.'s petition to vacate the arbitration award (Dkt. No. 1) is granted and Respondent Transmar Commodity Group Ltd.'s counterclaim to confirm the award (Dkt. No. 22) is denied.

So ordered.

Dated:   New York, New York
         September 21, 2016

                              _Louis L. Stanton_
                              LOUIS L. STANTON
                              U.S.D.J.

-14-